**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EJ NOBLE HOSPITAL<br>77 West Barney Street<br>Gouverneur, NY 13642<br><br>        Plaintiff,<br><br>        vs.<br><br>XAVIER BECERRA, as SECRETARY OF<br>THE UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES<br>200 Independence Avenue, S.W.<br>Washington, D.C.  20201<br><br>        Defendant. | Civil Action No. |

## **COMPLAINT**

Plaintiff EJ Noble Hospital (the "Hospital") brings this action against Defendant Xavier Becerra, in his official capacity as Secretary (the "Secretary") of the United States Department of Health and Human Services ("HHS"), and states as follows:

1. Plaintiff Hospital provides essential acute care hospital services in a rural and economically challenged region of upstate New York. At all relevant times, the Hospital has been designated by the Medicare program as a "Sole Community Hospital" ("SCH").

2. During its fiscal year that ended December 31, 2011 ("FY 2011"), the Hospital experienced a substantial decrease in its inpatient cases due to circumstances beyond its control, which by law required the Secretary to adjust the Hospital's usual Medicare inpatient payments. This adjustment is known as the Medicare Volume Decrease Adjustment ("VDA") payment.

1

3. The Hospital filed a timely application for a VDA payment, and the Secretary, acting through the Centers for Medicare and Medicaid Services ("CMS") and its Medicare Administrative Contractor ("MAC") issued a determination on November 21, 2013 approving a VDA payment to the Hospital in the amount of $478,324 (the "Original VDA Approval"). The Hospital did not appeal the Original VDA Approval because it was determined correctly.

4. Over two years later, on February 5, 2016, the MAC notified the Hospital of its intent to "reopen" the Original VDA Approval, *i.e.*, to recalculate the Hospital's original VDA payment. On July 22, 2016, the MAC issued a revised determination which reduced the Hospital's VDA payment to $0 (the "Revised VDA Approval"). As a result of the Revised VDA Approval, and because the Hospital had already received the original VDA payment, the Hospital was required to repay the Medicare program $478,324.

5. The Secretary has conceded that the Hospital experienced a decrease in inpatient volume greater than 5% and is therefore entitled to a VDA payment for FY 2011. The questions to be decided in this appeal are (a) whether the MAC properly reopened the Original VDA Approval; and alternatively (b) whether the VDA payment set forth in the Revised VDA Approval was correctly calculated.

6. The Original VDA Approval was calculated exactly as described in the Medicare Provider Reimbursement Manual ("PRM") and CMS's comments during rulemaking, that is, by subtracting total MS DRG payments (defined and discussed below) from the lesser of (a) the Provider's total Medicare inpatient operating costs (less any adjustment for excess staffing); or (b) the prior year's total Medicare inpatient operating costs updated for inflation (less any adjustment for excess staffing) (the "Historical VDA Approval Methodology"). *See* CMS Pub. 15-1, PRM § 2810.1.D; 71 Fed. Reg. 47,870, 48,056 (Aug. 18, 2006); 73 Fed. Reg. 48433,

48631 (Aug. 19, 2008). This is the methodology the MAC consistently applied and reported to CMS from the time it began calculating VDA payments until 2016, a period of over 25 years. Because the Historical VDA Approval Methodology compares similar concepts – total costs and total payments – the Hospital refers to this methodology as an "apples-to-apples" approach.

7. In 2016, the MAC abruptly changed its calculation method (the "Revised VDA Approval Methodology"). The MAC continued to subject the Hospital's total Medicare inpatient costs to the "prior year" and "excess staffing" tests, but added a new step which removed from the Hospital's total inpatient operating costs certain costs now alleged to be "variable." However, the MAC continued to subtract from this amount the Hospital's <u>total</u> MS DRG payments, even though a portion of those payments were intended to reimburse the Hospital for its variable costs. As a result, the MAC's Revised VDA Approval Methodology improperly compares dissimilar concepts – "fixed" costs and total payments. For that reason, the Hospital refers to this methodology as an "apples-to-oranges" approach.[1]

8. The Original VDA Approval utilized the Historical VDA Approval Methodology, which correctly applied an apples-to-apples comparison of total costs to total payments. The Revised VDA Approval applied the Revised VDA Approval Methodology, which improperly compared dissimilar concepts – "<u>fixed</u>" costs and <u>total</u> payments. The application of the Revised VDA Approval Methodology resulted in a significantly smaller VDA payment to the Hospital.

---

[1] As explained herein, in response to the Revised VDA Approval Methodology, the Board fashioned a third approach ("Board's VDA Methodology"). Recognizing that MS-DRG payments include a component designed to reimburse a hospital for its variable costs, the Board's VDA Methodology reduces MS-DRG payments to exclude the "variable" cost component. Because this third methodology compares similar concepts - "fixed" costs and "fixed" payments - a continuation of the first analogy would suggest an "oranges-to-oranges" approach. CMS has adopted this methodology through rulemaking prospectively for fiscal years beginning on or after October 1, 2017. 82 Fed. Reg. 37990, 38179-83 (Aug. 14, 2017).

9.      Put more simply, for over twenty-five years, the MAC properly applied the applicable law and program instructions one way and reported the resulting determinations to CMS.  Starting in 2016, the MAC began to apply the applicable law and program instructions differently – without any intervening changes to the law or explicit notice from CMS.  The Secretary, by allowing the MAC to reopen a properly issued final determination and then adopting this new methodology through adjudication, has violated the Medicare statute and the Administrative Procedures Act.

## PARTIES

10.     Plaintiff EJ Noble Hospital is a Medicare participating acute care hospital located in Gouverneur, New York.  At all relevant times, the Hospital was classified as a SCH under Section 1886(d)(5)(D )(iii) of the Social Security Act (the "Act").

11.     Defendant Xavier Becerra is the Secretary of HHS and is the federal official responsible for administering the Medicare program under Title XVIII of the Act.

## JURISDICTION AND VENUE

12.     This action arises under the Medicare Act (Title XVIII of the Act, 42 U.S.C. §§ 1395 *et seq*. and the Administrative Procedure Act 5 U.S.C. §§ 551 *et seq*. This court has jurisdiction under 28 U.S.C. § 1331 and § 1361, and 42 U.S.C. § 1395oo(f)(1).

13.     Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(l) and 28 U.S.C. § 1391(c).

## STATUTORY AND REGULATORY BACKGROUND

**A.      The Medicare Program and the Appeal Process**

14.     The Hospital is provider of medical services to beneficiaries of the federally administered Medicare Program as set forth in 42 U.S.C. § 1395 *et seq.* ("Medicare Act").

15. CMS is the agency within HHS charged with administrating the Medicare program.

16. CMS's hospital payment functions are contracted to organizations known as MACs.

17. During each cost reporting period, a MAC determines the payment amounts due to providers under the Medicare statutes, regulations, and interpretive guidelines published by CMS.  After the MAC makes a final determination, it sends to the provider a Notice of Program Reimbursement ("NPR").

18. In addition to issuing NPRs, a MAC may make other final determinations, including a VDA payment determination.  42 C.F.R. § 412.92(e)(3); 54 Fed. Reg. 36452, 36480 (Sep. 1, 1989).

19. A hospital may appeal the MAC's final determination to the Provider Reimbursement Review Board ("PRRB" or "Board") pursuant to 42 U.S.C. § 1395oo(a) and 42 C.F.R. § 405.1835.  The PRRB is a sub-agency within HHS that serves as an administrative review panel for final determinations made by CMS or the MAC.  The members of the PRRB must be "knowledgeable in the field of payment to providers of service" under the Medicare program.  *See* 42 U.S.C. § 1395oo(h).

20. The decision of the PRRB is final unless the Secretary reverses, affirms, or modifies the PRRB's decision within 60 days of the provider being notified of the PRRB's decision.  *See* 42 U.S.C. § 1395oo(f)(1).  A hospital has the right to obtain judicial review of any final decision of the PRRB, or any reversal, affirmance, or modification of the PRRB's decision by the Secretary.  *See* 42 U.S.C. § 1395oo(f); 42 C.F.R. § 405.1877.

**B.     Medicare Reimbursement**

21.     Medicare's hospital insurance program, known as Part A, provides certain benefits covering inpatient hospital, nursing facility, home health and hospice services.  Until October 1983, Medicare paid participating hospitals for the "reasonable costs" that they actually incurred in providing inpatient services.  To address the increasing costs of inpatient services, Congress amended the Medicare Act in 1983 to create a new payment system for virtually all acute care hospitals known as the inpatient prospective payment system ("IPPS").

22.     Under IPPS, hospitals are no longer paid for the reasonable costs incurred in providing inpatient care.  Instead, CMS pays a fixed, prospectively determined amount assigned to the applicable diagnosis-related group ("DRG") for each patient discharge, subject to special rules for certain supplemental payments.  Specifically, the fixed DRG-based per discharge rates under IPPS are designed to be payment in full for the hospital's inpatient operating costs, 42 U.S.C. § 1395ww(d)(1)(A), which include "all routine operating costs … and includes the costs of all services for which payment may be made under this subchapter that are provided by the hospital …," 42 U.S.C. § 1395ww(a)(4).

23.     The DRG payments compensate a hospital for all such costs – whether fixed or variable – incurred in providing care to an inpatient, regardless of the hospital's actual operating costs.  42 U.S.C. § 1395ww(d)(1).  Therefore, hospitals are generally at financial risk that their costs for treating a particular patient may exceed the IPPS rates.

24.     Medicare's IPPS assumes that fixed DRG payments based on cases of average complexity and typical inpatient volume will on average adequately compensate efficiently run hospitals.

### C. The VDA Methodology and Payment

25. Recognizing these assumptions may unfairly burden SCHs, which are often a rural community's only source of necessary inpatient healthcare, Congress mandated special payment exceptions and adjustments for those hospitals "to take into account … the special needs of [SCH] …or essential community services, and to take into account extraordinary circumstances beyond the hospital's control, … significantly fluctuating population in the services area of the hospital, and unusual labor costs…"  42 U.S.C. § 1395ww(a)(2)(A).

26. For example, Medicare pays a SCH's inpatient operating costs at "an amount based on 100 percent of the hospital's target amount for the cost reporting period, as defined in subsection (b)(3)(C)," or "the amount determined under paragraph (1)(A)(iii)[DRG based payments], <u>whichever results in greater payment to the hospital</u>."  42 U.S.C. § 1395ww(d)(5)(D)(i)(I) and (II)(emphasis added).

27. Another example is the VDA payment.  Pursuant to the Act, certain hospitals that experience significant, uncontrollable decreases in inpatient volume, are entitled to an additional payment adjustment known as the VDA payment.  *See* 42 U.S.C. § 1395ww(d)(5)(D)(ii).

28. The VDA statute provides:

> In the case of a sole community hospital that experiences, in a cost reporting period compared to the previous cost reporting period, a decrease of more than 5 percent in its total number of inpatient cases due to circumstances beyond its control, **the Secretary shall provide for such adjustment** to the payment amounts under this subsection . . . as may be necessary **to fully compensate the hospital for the fixed costs it incurs in the period in providing inpatient hospital services**, **including the reasonable cost of maintaining necessary core staff and services**.

42 U.S.C. § 1395ww(d)(5)(D)(ii) (emphasis added).

29. The Secretary's implementing regulations provide that, in order to qualify for the VDA payment, a hospital must:

7

>   (i) Submit to the intermediary documentation demonstrating the size of the decrease in discharges, and the resulting effect on per discharge costs; and
>
>   (ii) Show that the decrease is due to circumstances beyond the hospital's control.

42 C.F.R. § 412.92(e)(2).

30. Once a hospital demonstrates that it qualifies for a VDA payment, the MAC calculates the amount of the payment. The regulations in effect when the MAC issued the Original VDA Approval and the Revised VDA Approval read as follows:

>   (3) The [MAC] determines a lump sum adjustment amount not to exceed the difference between the hospital's Medicare inpatient operating costs and the hospital's total DRG revenue for inpatient operating costs based on DRG-adjusted prospective payment rates for inpatient operating costs . . . .
>
>   (i) In determining the adjustment amount, the [contractor] considers --
>
>   (A) The individual hospital's needs and circumstances, including the reasonable cost of maintaining necessary core staff and services in view of minimum staffing requirements imposed by State agencies;
>
>   (B) The hospital's fixed (and semi-fixed) costs, other than those costs paid on a reasonable cost basis under part 413 of this chapter; and
>
>   (C) The length of time the hospital has experienced a decrease in utilization.

42 C.F.R. § 412.92(e)(3).

31. During several separate notice-and-comment rulemaking processes, CMS specifically interpreted and explained the payment calculation as follows: "The adjustment amount [VDA] is determined by subtracting the second year's DRG payment from the lesser of: (a) the second year's costs minus any adjustment for excess staff; or (b) the previous year's costs multiplied by the appropriate IPPS update factor minus any adjustment for excess staff. The

8

[hospital] receives the difference in a lump-sum payment. 71 Fed. Reg. 47,870, 48,056 (Aug. 18, 2006); 73 Fed. Reg. 48433, 48631 (Aug. 19, 2008) (emphasis added).

32. The Secretary has provided an additional interpretation of the VDA statute and related regulation in the PRM. The PRM provides "guidelines and policies to implement Medicare regulations." PRM Forward. The PRM in effect when the MAC issued the Original VDA Approval and the Revised VDA Approval contained the following example:

> EXAMPLE A: Hospital C has justified an adjustment to its DRG payment for FYE September 30, 1987. The adjustment is calculated as follows:
>
> Hospital C
>
> PPS Payment Adjustment
>
> Fiscal Year Ended 09/30/87
>
> | | | |
> |---|---|---|
> | FY 1986 Program Operating Cost | | $2,900,000 |
> | PPS Update Factor | x | 1.0115 |
> | FY 1987 Maximum Allowable Cost | | $2,933,350 |
> | | | |
> | FY 1987 Program Inpatient Operating Cost | | $2,800,000 |
> | FY 1987 DRG Payment | – | $2,500,000 |
> | FY 1987 Payment Adjustment | | $ 300,000 |

PRM § 2910.1.D.

33. The PRM identifies the sources for "Program Operating Cost" as Worksheet D-1, Part II of the Medicare cost report and "DRG Payment" as Worksheet E, Part A of the Medicare cost report, respectively.

34. With respect to this example, the PRM provides that "Since Hospital C's FY 1987 Program Inpatient Operating Cost was less than that of FY 1986 increased by the PPS update factor, its adjustment is the entire difference between FY 1987 Program Inpatient Operating Cost and FY 1987 DRG payments." *Id.* (emphasis added).

9

35. Again, the exact approach identified in this example has been endorsed by the Secretary in the Federal Register. 71 Fed. Reg. 47,870, 48,056 (Aug. 18, 2006); 73 Fed. Reg. 48433, 48631 (Aug. 19, 2008).

36. In short, the PRM and guidance from the Secretary instructs that the VDA payment be calculated by subtracting <u>total DRG payments</u> from <u>total inpatient operating costs</u> (adjusted for the PPS update factor and excess staffing). This is the Historical VDA Approval Methodology used by the MAC.

37. The MAC applied Historical VDA Approval Methodology when issuing the Original VDA Approval at issue in this appeal.

38. In 2016, the MAC reopened the Original VDA Approval and recalculated the amount of the Hospital's VDA payment. The recalculation adjusted total inpatient operating costs but did not adjust the total DRG payments (which are subtracted from the inpatient operating costs to determine the VDA payment). This is the Revised VDA Approval Methodology.

39. In a series of prior cases, including the instant case below, the PRRB concluded that the Revised VDA Approval Methodology fails to account for the important fact that IPPS payments include reimbursement for both fixed and variable costs. The PRRB has concluded that accounting for that fact is necessary "so there is an 'apples-to-apples' comparison" of the costs and payments required by the statute. *See* **PRRB Decision, attached as Exhibit 1, at 11**.

40. The Secretary has recognized the PRRB's concerns with the Revised VDA Methodology:

> [W]e understand why hospitals might take the view that CMS should make an effort, in some way, to ascertain whether a portion of MS-DRG payments can be allocated or attributed to fixed costs in order to fulfill the statutory mandate to "fully compensate" a

10

> qualifying SCH for its fixed costs. [T]he main issue raised by the PRRB and individual hospitals is that, under the current calculation methodology, if the hospital's total MS-DRG revenue for treating Medicare beneficiaries for which it incurs inpatient operating costs (consisting of fixed, semifixed, and variable costs) exceeds the hospital's fixed costs, the calculation by the MACs results in no volume decrease adjustment for the hospital. In some recent decisions, the PRRB has indicated that it believes it would be more appropriate for the MACs to adjust the hospital's total MS-DRG revenue from Medicare by looking at the ratio of a hospital's fixed costs to its total costs (as determined by the MAC) and applying that ratio as a proxy for the share of the hospital's MS-DRG payments that it assumes are attributable (or allocable) to fixed costs, and then comparing that estimate of the fixed portion of MS-DRG payments to the hospital's fixed costs. In this way, the calculation would compare estimated Medicare revenue for fixed costs to the hospital's fixed costs when determining the volume decrease adjustment.

82 Fed. Reg. 37,990, 38,180 (Aug. 14, 2017).

41. In the 2018 IPPS final rule, the Secretary adopted the PRRB's position, but only for cost reporting periods beginning after October 1, 2017. *See* 82 Fed. Reg. at 38,511. The Secretary's "new" methodology – which is the Board's VDA Methodology – calculates the VDA payment by taking fixed inpatient operating costs and subtracting estimated Medicare payments attributable to the fixed costs a hospital incurs in treating inpatient Medicare beneficiaries. The result is the amount of an eligible hospital's VDA payment.

42. The Secretary refuses to apply the Board VDA Methodology to cost reporting periods beginning <u>before</u> October 1, 2017.

**D.    Reopening Regulations**

43. The Original VDA Approval constituted a final determination under 42 C.F.R. § 405.1801.

44. Final determinations may be reopened only in the specific circumstances and pursuant to the process set forth in 42 C.F.R. §§ 405.1885-1889. A determination may be

11

reopened either on the "own motion" of the CMS or the MAC or at the request of the provider. 42 C.F.R. § 405.1885(a)(2).

45. If a final determination is reopened by the MAC, the MAC must adhere to the procedures for reopening set forth in the regulations. *See* 42 C.F.R. § 105.1885.

46. There are two kinds of reopenings – discretionary reopenings and mandatory reopenings. Mandatory reopenings are governed by 42 C.F.R. § 405.1885(c)(1)(i), which provides:

> A contractor determination … *must* be reopened and revised if CMS provides *explicit notice* to the contractor that the contractor determination or the contractor hearing decision is inconsistent with the applicable law, regulations, CMS ruling, or other interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS in effect, and as CMS understood those legal provisions, at the time the determination or decision was rendered by the contractor. CMS may also direct the contractor to reopen a particular contractor determination or decision in order to implement a final agency decision … a final, non-appealable court judgment … or an agreement to settle an administrative appeal or a lawsuit, regarding the same determination or decision.

47. This provision has been further interpreted by the PRM, which provides that "determination and a decision will be reopened and corrected by [a MAC] if … [CMS] notifies the [MAC] in *writing* that such determination or such decision is inconsistent with the applicable law, regulations, or general instructions issued by [CMS]." PRM Section 2931.1(C).

## FACTUAL AND PROCEDURAL BACKGROUND

48. In the Hospital's 2011 fiscal year, the Hospital, through no fault of its own, experienced a greater than five percent decline in inpatient discharges from the prior cost reporting period. By letter dated June 13, 2013, the Hospital submitted a timely request to the MAC for a VDA payment.

49. By letter dated November 21, 2013, the MAC approved a VDA payment of $478,324 (the Original VDA Approval). The MAC agreed that the Hospital (i) demonstrated a decrease in discharges greater than five percent and identified the resulting effect on per-discharge costs, and (ii) showed that the decrease was due to circumstances beyond the hospital's control. 42 C.F.R. § 412.108(d)(3).

50. The MAC calculated the Original VDA Approval payment using the Historical VDA Approval Methodology as follows:

| | |
|---|---|
| Total Inpatient Operating Costs | $3,004,718 |
| PPS Update Factor | 1.0235 |
| Maximum Allowable Cost | $3,075,329  A |
| | |
| Settled Program Inpatient Oper Costs | $3,437,442 |
| Adjusted Program Inpatient Oper Costs | $3,437,442  B |
| | |
| Lesser of A or B | $3,075,329 |
| Total DRG Payments | $2,597,050 |
| Final Payment Adjustment | $   478,324 |

51. Because the Historical VDA Methodology was consistent with the plain language of the applicable statute, regulation, and CMS program instructions, the Hospital did not appeal the Original VDA Approval pursuant to 42 U.S.C. § 1395oo.

52. By letter dated February 5, 2016, the MAC purported to reopen the Original VDA Approval. The MAC's letter stated:

> This letter is to notify your facility that a revised determination of the submitted Volume Decrease Adjustment (VDA) is being made based on direction from the Centers for Medicare and Medicaid Services (CMS). We have been directed to review and recalculate the VDA to revise all variable expenses.

53. The language contained in the MAC's letter makes clear that this reopening is a mandatory reopening.

13

54. Despite the MAC's assertion that it had been "directed to review and recalculate the VDA," the MAC failed to include in the administrative record any evidence that CMS provided any such direction in writing or that such written direction identified the applicable law which CMS understood to be inconsistent with the MAC's Original VDA Approval, as required by 42 C.F.R. § 405.1885(c)(1)(i) and PRM Section 2931.1(C) .

55. The Hospital objected to the MAC's purported reopening of the Original VDA Approval, but provided the MAC with certain, additional information that it had requested in its reopening notice.

56. By letter dated July 22, 2016, the MAC issued the Revised VDA Approval. The workpapers attached to the MAC's Revised VDA Approval demonstrate that the MAC applied the Revised VDA Approval Methodology.

57. In applying the Revised Approval Methodology, the MAC reduced the Hospital's inpatient operating costs by 8.9% to reflect the portion of the Hospital's total inpatient operating costs allegedly attributable to variable costs. From that adjusted inpatient operating costs number, the MAC subtracted the Hospital's total DRG payments.

58. Based on this calculation, the MAC's Revised VDA Approval awarded no VDA payment. Because the MAC had already paid the Provider $478,324 following the Original VDA Approval, the Hospital was required to repay the MAC $478,324.

59. The Hospital filed a timely appeal of the Revised VDA Approval with the PRRB.

60. Before the PRRB, the parties stipulated to the following facts, among others:

a. By a letter dated June 13, 2013, the Provider timely filed a request for a VDA payment ("VDA Request") with the MAC.

b. On November 4, 2013, November 5, 2013, and November 6, 2013, the MAC requested that the Provider submit additional information related to the VDA Request.

  c.  On November 4, 2013, November 5, 2013, and November 6, 2013, the Provider submitted the additional information requested by the MAC.

  d.  The MAC reviewed the Provider's VDA Request, and the additional information requested in accordance with its historical process. Based on this review, the MAC determined that the Provider had experienced a decrease of more than 5 percent in its total number of inpatient cases due to circumstances beyond its control and was therefore entitled to a VDA payment.

  e.  By a letter dated November 21, 2013, the MAC issued a final determination approving the Provider's VDA Request ("Original VDA Approval").

  f.  Subsequently, the MAC sent the Provider a letter dated February 5, 2016, which included the following statement:

> This letter is to notify your facility that a revised determination of the submitted Volume Decrease Adjustment (VDA) is being made based on direction from the Centers for Medicare and Medicaid Services (CMS). We have been directed to review and recalculate the VDA to remove all variable expenses.

  g.  By a letter dated July 22, 2016, the MAC issued a revised final adjustment amount ("Revised VDA Approval"). The Revised VDA Approval awarded a VDA payment in the amount of $0.

  h.  As a result of the Revised VDA Approval, the Provider was required to repay the MAC $478,324.

61.  On March 17, 2022, after a hearing on the record, the PRRB issued its decision. The PRRB found that the MAC had improperly calculated the Revised VDA Approval payment, finding:

> Critical to the proper application of the statute, regulation and PRM provisions related to the VDA, are the unequivocal facts that: (1) the Medicare patients to which a provider furnished *actual* services in the current year are not part of the volume decrease, and (2) the DRG payments made to the hospital for services furnished to Medicare patients in the current year are payments for *both* the fixed and variable costs of the *actual* services furnished to those patients. Therefore, in order to fully compensate a hospital for its fixed costs in the current year, the hospital must receive a payment for the variable costs related to its *actual* Medicare patient load in the current year, as well as its full fixed costs in that year.

**PRRB Decision (Ex. 1), at 15.**

62.     The PRRB determined that the MAC should have applied the Board VDA Methodology, pursuant to which the Hospital would receive a VDA payment of $177,121. Because the Hospital had reimbursed the Original VDA Approval payment of $478,324, the PRRB held that the Hospital was entitled to receive a payment of $177,121.

63.     On March 29, 2022, the CMS Administrator notified the Hospital that it would review the PRRB's decision.  The CMS Administrator issued its decision on May 13, 2022.  The Administrator reversed the decision of the PRRB and upheld the MAC's Revised VDA Approval.  *See* **Administrator Decision, attached here as Exhibit 2.**

## COUNT I
### (Violation of the Medicare Statute and Administrative Procedure Act)

64.     The Hospital repeats the allegations in paragraphs 1 through 63 as if set forth fully herein.

65.     The Medicare statute provides for judicial review of a final agency decision in cases like the one before this court pursuant to the provisions of the Administrative Procedure Act ("APA"). 42 U.S.C. § 1395oo(f)(1).

66.     The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . .(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence[.]"  5 U.S.C. § 706(2).

<u>Improper Reopening of the Original VDA Approval</u>

67.     The MAC reopened its Original VDA Approval to apply the Revised VDA Approval Methodology in violation of the regulations relating to reopenings.

68. The MAC's reopening was mandatory, as set forth in its reopening notice. That notice stated that the MAC had "been directed to review and recalculate the VDA to revenue all variable expenses."

69. Under 42 C.F.R. § 405.1885(c)(1)(i) and the PRM, mandatory reopenings require written direction from CMS that states that the MAC's original determination was "inconsistent with the applicable law, regulations, or general instructions issued by [CMS]."

70. The administrative record contains no written direction from CMS to reopen the Original VDA Approval that meets the requirements of 42 C.F.R. § 405.1885(c)(1)(i) and the PRM.

71. The MAC's reopening cannot meet the requirements of a discretionary reopening, as the Original VDA Approval was issued at the MAC's discretion, reported to CMS, and complied with the applicable regulations and PRM provisions, as interpreted by CMS during the relevant time period. 71 Fed. Reg. 47,870, 48,056 (Aug. 18, 2006); 73 Fed. Reg. 48433, 48631 (Aug. 19, 2008).

Application of the VDA Statute

72. The purpose of the VDA adjustment is to "fully compensate" the hospital for the fixed costs it incurs in the period in providing inpatient hospital services. The Revised VDA Approval Methodology used in this case by the MAC and the Secretary does not satisfy this statutory requirement.

73. The Medicare Act makes clear that DRG payments are intended to be compensation for all inpatient operating costs, whether fixed and variable. 42 U.S.C. § 1395ww(a)(4). The Revised VDA Approval Methodology adopted by the Secretary in this

appeal disregards this undisputed fact, and willfully pretends that the Hospital's total DRG payments were intended to reimburse fixed costs only.

74.     Because the Revised VDA Approval Methodology has mistakenly treated the Hospital's total DRG payments as reimbursement for fixed costs only, the Secretary has mistakenly used the intended variable cost reimbursement to satisfy payment of the Hospital's otherwise uncompensated fixed costs.

75.     This is a direct result of the Secretary's application of an apples-to-oranges comparison which arbitrarily and capriciously compares total DRG payments to the Hospital's fixed costs.

76.     The Revised VDA Approval Methodology and its application of the apples-to-oranges comparison was based on an unlawful and unreasonable interpretation of the clear statutory mandate. It was also inconsistent with the Secretary's prior, clearly stated interpretation of the applicable regulations. 71 Fed. Reg. 47,870, 48,056 (Aug. 18, 2006); 73 Fed. Reg. 48433, 48631 (Aug. 19, 2008); PRM § 2910.1.D.

CMS's Adoption of the Revised VDA Approval Methodology

77.     The Medicare Act provides that "[n]o rule, or other statement of policy ... that establishes or changes a substantive legal standard governing ... the payment for services ... shall take effect unless it is promulgated by the Secretary by regulation." 42 U.S.C. § 1395hh(a)(2).

78.     The method that HHS used to calculate the Hospital's Revised VDA Approval is a "rule" that changed a substantive legal standard governing the payment for services within the meaning of the Administrative Procedures Act ("APA"), 5 U.S.C. § 551(3), and therefore required notice and comment prior to adoption.

79. The Historical VDA Approval Methodology and the Revised VDA Approval Methodology represent different substantive legal standards for calculating the VDA payment, as evidenced by the different payment amounts calculated by the respective methodologies in this very appeal.

80. The Secretary has previously published through the notice-and-comment rulemaking a clearly stated interpretation of the applicable regulations which required application of the Historical VDA Approval Methodology.  71 Fed. Reg. 47,870, 48,056 (Aug. 18, 2006); 73 Fed. Reg. 48433, 48631 (Aug. 19, 2008); PRM § 2910.1.D.

81. The Secretary failed to follow notice-and-comment rulemaking before adopting and applying the Revised VDA Methodology in the appeal, in violation of the APA.

## **PRAYER FOR RELIEF**

WHEREFORE, EJ Noble Hospital requests that this Court:

1. Rule that the Secretary's decision finding that the MAC properly reopened the Original VDA Approval was (A) in excess of statutory authority or limitation or short of statutory right, (B) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, (C) without observance of procedure required by law, and/or (D) unsupported by substantial evidence under the APA, 5 U.S.C. §§ 553 and 706, and therefore reinstate the Original VDA Approval and require the Secretary to repay the Hospital any money recovered during the reopening (including any interest paid as a result of the reopening);

2. Alternatively, rule that the Secretary's decision to modify the PRRB's decision was (A) in excess of statutory authority or limitation or short of statutory right, (B) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, (C) without observance of procedure required by law, and/or (D) unsupported by substantial evidence under the APA, 5 U.S.C. §§ 553 and 706 and therefore reinstate the PRRB's decision;

3. Enter an order vacating the Secretary's decision and remanding the appeal to the agency with instructions to recalculate and pay a VDA payment in accordance with the Court's ruling under (1) or (2) above, together with interest due on the payment under 42 U.S.C. § 1395oo(f)(2), and requiring the Secretary to pay the Hospital's legal fees and costs of suit; and

4. Provide such other and further relief as the court deems just and proper.

Dated: June 20, 2022

/s/ Rachel M. Wertheimer
Rachel M. Wertheimer
William S. Stiles
VERRILL DANA LLP
One Portland Square
Portland, ME 04101-4054
Telephone: (207) 253-4620
Facsimile: (207) 253-4621
rwertheimer@verrill-law.com
wstiles@verrill-law.com
*Pro Hac Vice Forthcoming*

Counsel for Plaintiff EJ Noble Hospital

20438872_1